J-S33016-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: INVOLUNTARY TERMINATION OF K.Z, A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: B.Z., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 735 MDA 2024 |

Appeal from the Decree Entered April 29, 2024
In the Court of Common Pleas of Lebanon County Orphans' Court at
No(s): 2023-00916

BEFORE: OLSON, J., KUNSELMAN, J., and NICHOLS, J.

MEMORANDUM BY KUNSELMAN, J.: **FILED NOVEMBER 05, 2024**

B.Z. (Mother) appeals from the decree entered by the Lebanon County Orphans' Court, which terminated her rights to her 3-year-old son, K.Z. (the Child), pursuant to the Adoption Act. ***See*** 23 Pa.C.S.A. § 2511(a)(1), (a)(2), (a)(5), (a)(8); (b). After review, we affirm.[1]

In its detailed opinion filed pursuant to Pa.R.A.P. 1925(a), the orphans' court set forth the factual and procedural history:

> Lebanon County Children & Youth Services (hereinafter "CYS") became involved with the family on October 8, 2020, following a referral expressing concerns that there was a lack of parenting skills as well as the [the Child's] failure to thrive, lack of gaining weight, and several weight changes. CYS received a second referral on October 16, 2020, again addressing concerns of the Child's weight and not seeing the doctor since September 28, 2020. On October 18, 2020, CYS received a third referral that was made subsequent to

---

[1] The court also terminated the rights of R.Z. (Father), whose appeal is separately listed. ***See*** 1164 MDA 2024.

the Child being hospitalized on October 16, 2020, for failure to thrive. While the Child was hospitalized, there were concerns regarding the parents' missing feedings for the [] Child. The referral made on October 18, 2020, referenced concerns for the [Child's] failure to thrive, lack of appropriate parenting skills, and concerns for Mother's mental health.

Upon the Child's discharge from the hospital, a safety plan was put in place on October 22, 2020. JusticeWorks [*sic*] Family of Services ("JusticeWorks") began working with the family on October 28, 2020, to help the parents stay on a feeding schedule and make sure they were following the safety plan. During JusticeWorks' involvement with the family from October 28, 2020, until January of 2021, there were concerns regarding the [Child's] nutrition, lack of appropriate feeding, conflict in the parents' relationship, dirty home conditions, and the Mother being left alone with the Child for extended periods of time. There were additional concerns that the parents were unreceptive to feedback from the Child's doctors, CYS, and JusticeWorks. It was noted that the parents were argumentative and would deflect responsibility onto others.

On December 14, 2020, the Child was hospitalized again due to not gaining a sufficient amount of weight. At that time, the hospital recommended that the Child be admitted but Father was adamant that the child not stay overnight. It was only once CYS informed the Father that they would request emergency custody of the [Child] if he went against medical advice that the Father allowed the hospital to admit the Child. During the Child's hospitalization, the parents needed to be woken up and prompted to feed the Child. On December 19, 2020, CYS received a Child Protective Services referral regarding the [Child's] failure to thrive. This was the fourth referral CYS received regarding the family. The parents continued to deny and deflect responsibility. []

Due to ongoing concerns, on December 20, 2020, guardianship was turned over to an individual by the name of [T.S.]. During the time the Child was under the guardianship of [T.S.], the parents visited the Child; however, they were consistently late to visits or missed visits, and often interacted minimally with the Child. The

Child remained in the care of [T.S.] until March 19, 2021, when guardianship was signed over to [A.H.].

On February 9, 2021, the child abuse investigation concluded, and Mother and Father were both indicated as perpetrators of abuse for failure to provide nutrition and hydration to the Child. On May 5, 2022, both Mother and Father were charged with one count of Endangering Welfare of Child, a felony of the second degree, and one count of Conspiracy Endangering Welfare of Child, also a felony of the second degree. Both Mother and Father were placed into the Accelerated Rehabilitative Disposition (ARD) program. The Father was later terminated from the ARD program for use of methamphetamines and possession of methamphetamines.

Due to the parents' lack of significant progress on their goals listed on the Family Service Plan, lack of cooperation with CYS and JusticeWorks, refusal to acknowledge responsibility, ongoing concerns for the condition of the home, Mother's mental health, and the parent's unstable relationship, CYS filed a Dependency Petition on June 22, 2021. Following a hearing on June 28, 2021, the Court found the Child dependent on the grounds that the child was without proper parental care or control pursuant to 24 Pa. C.S. § 6302. [] At that time, legal custody of the Child was granted to CYS, and physical custody was granted to [A.H.].

In April of 2022, JusticeWorks closed its file unsuccessfully due to the parents' lack of cooperation. The Child remained with [A.H.] until August 4, 2022, when the physical custody was transferred to CYS and the Child was placed in a foster home. The Child has remained in the same CYS approved foster home since his placement on August 4, 2022.

Neither Mother nor Father have completed their goals outlined in the Child Permanency Plan dated July 19, 2023. Mother had eleven goals on the most recent child permanency plan, seven of which were goals for Mother since the initial family service plan was put in place on October 28, 2020. Father had fifteen goals on the most recent child permanency plan, five of which were goals since the initial family service plan dated October 28, 2020. In August of 2022, CYS re-added goals relating to drug and

- 3 -

alcohol evaluation and random drug screens to Service Plan for the Father, as there were new concerns at that time.

Diakon Family Preservation and Reunification Services (hereinafter "Diakon") was referred to the family on October 13, 2023, to assist in addressing their goals. Permanency Review Hearings were held on October 12, 2022, December 5, 2022, April 11, 2023, and August 15, 2023. At these hearings, the Court found that compliance with the Child Permanency Plan and progress towards alleviating the circumstances that necessitated placement was inconsistent.

On November 29, 2023, CYS filed a Petition for Involuntary Termination of Parental Rights seeking termination of the parental rights of both parents under 23 Pa.C.S. §2511(a)(1), 23 Pa.C.S. § 2511(a)(2). 23 Pa.C.S. §2511(a)(5), and 23 Pa.C.S. § 2511(a)(8). []

A hearing on the Petition for Involuntary Termination was held on January 12, 2024. Michelle Curry, family service supervisor for CYS, was one of the caseworkers involved in this case. Ms. Curry testified at the Termination Hearing that a Permanency Plan was prepared setting out goals for both Mother and Father and that many of the goals have remained the same throughout the dependency case. The Court heard testimony during the Termination Hearing about Mother's and Father's goals and progress toward completing these goals.

Both parents had goals to cooperate with CYS and to follow all recommendations. They both also had goals to maintain stable income and stable housing for a period of 6 months as well as to inform CYS of any address, phone number, or household member changes. The parents were not consistently cooperative with CYS and did not always follow all recommendations that were made. It is noted in Ms. Curry's testimony that the parents were not receptive to the recommendations and were instead argumentative with CYS. Further, the parents were not cooperative with JusticeWorks either and eventually that service was closed unsuccessfully. The parents never maintained steady housing for periods of six months and were constantly moving around including an eviction, staying with family members, and staying at hotels. Mother never sustained

- 4 -

steady employment for a period of six months and was not currently employed at the time of the hearing. Although Father was employed, he failed to provide paystubs to CYS for proof of income. The parents were also not always forth coming and failed to inform CYS of all address changes and household member changes. CYS received a report about the parents' relationship and were made aware that the parents had another child, however CYS was unable to confirm the birth until about a month later because the parents made false statements regarding the newborn's existence.

Another goal on both parents' plans was to attend all medical appointments for the Child. Even though the parents were given notice, they only attended three or four, out of thirteen, medical appointments for the Child. The parents did meet the goals related to involvement in the [Child's] placement and did attend scheduled visits once they were set up. However, there was a gap from the time the Child entered the foster home to when visitation actually began due to parents' lack of communication with CYS.

There were additional concerns regarding the parents and their progression on the goals. One goal was to obtain and provide documentation of a mental health evaluation and follow recommendations of that mental health evaluation. Mother did have a mental health evaluation done in October of 2021 and did provide documentation to CYS regarding that appointment but was eventually unsuccessfully discharged from counseling due to not attending sessions. CYS did ask Mother to get an updated mental health evaluation in June of 2022, however Mother has failed to provide any documentation of that evaluation.

[…]

Although not part of the goals established in the Permanency Plan, CYS did have other ongoing concerns, particularly regarding the parents' unstable relationship with each other. The Court heard testimony that CYS had received multiple reports about the parents' frequently changing, on and off again, relationship. Ms. Curry testified that, as of the date of the hearing there were still ongoing concerns that she did not believe additional time would resolve. Given those concerns, as well as the [Child] being

in placement for three years at that point, Ms. Curry concluded that terminating parental rights would be in the [] Child's best interest.

The Termination of Parental Rights hearing testimony continued on April 2, 2024. The Court heard testimony from Jacqueline Kissel who became the caseworker in this matter as of July 2023. Ms. Kissel testified about the parents' lack of progression on their goals and lack of cooperation with CYS. Ms. Kissel stated that the parents' cooperation only increased after the termination of parental rights proceedings began in January. Ms. Kissel also testified that Diakon was put in place in November 2023 to help with parenting skills and to provide resources to the parents to help find employment and housing. However, due to the parents' lack of progress in finding employment and housing, Diakon asked to reduce service hours and was considering closing the case.

Ms. Kissel testified that part of her duties as the new caseworker was to prepare an updated permanency plan, dated March 22, 2024. The revised permanency plan contained updates regarding the case from the time of the previous termination hearing, January 12, 2024, through the date of this second hearing, April 2, 2024. Ms. Kissel also testified regarding the parents' progress, or lack thereof, when it came to completing the goals set out in the plan.

The Court heard from Ms. Kissel that Mother still had not obtained stable employment for a period of six months and did not have a stable income. Mother received a financial benefit for attending an online university and told CYS that she planned to use those funds for housing and fixing the car. However, Ms. Kissel noted that as of the date of the hearing, the car had not been fixed and housing had not been obtained. Instead, Ms. Kissel observed Mother spending the money on material items such as new clothes, new shoes, getting her hair and nails done, and pajamas for the Child. As for the goal of obtaining a mental health evaluation and following recommendations, Mother still was non-compliant and did not provide CYS with the results of the evaluation.

[…] As of the April 2nd hearing, the parents had failed to attend all of the Child's medical appointments even though they were given notice. Similar to prior testimony, the [c]ourt heard that the parents' relationship was unstable; at time[s] the parents did not live together.

Testimony regarding the parents' visitation with the Child was presented. The parents had six-hour visits on Sundays with the [Child]; however, they were frequently late for visits. There were also times that the visits were cancelled. Ms. Kissel testified that out of 18 scheduled supervised visits, 9 were cancelled. When the visits were unsupervised, 18 out of 139 were cancelled. However, when the parents did miss or cancel visits, the Child had no reaction. During those visits the parents would play outside with the [Child] and took the [Child] to Hershey Chocolate World. The parents would also provide gifts for the Child.

At the time of the hearing, the original concern of the Child's failure to thrive had been alleviated. By this point, the Child had been out of the care of the parents for three and a half years. The foster family continued to provide stability and structure for the Child. The Child excelled in the foster home and refers to the foster parents as "mom" and "dad." It should be noted that the Child does also refer to biological parents as "mom" and "dad." Ms. Kissel testified that she does not believe that additional time or services would get the parents to the point where they would have consistent employment, income, or housing. At that time, due to ongoing concerns, Ms. Kissel concluded that CYS believed that terminating parental rights would be in the Child's best interest.

[…]

A final hearing on the Petition for Involuntary Termination was held on April 29, 2024. At the hearing, the Court heard testimony from Mother[.] Mother testified the family was living with her sister. Mother stated that she was still not employed. Mother did testify that she had made an appointment for a mental health evaluation as of February of that year, even though the goal to get the evaluation was on the Permanency Plan since the summer of 2022. As for the unstable relationship between the parents, Mother was asked if she was aware that CYS had reports of them

splitting up twelve times throughout their involvement with the family. Mother stated that she did not think it was that many time[s] nor did she recall making certain statements to CYS regarding the multiple reasons for splitting up each time. The Court did hear testimony about a bond the Child has with Mother, Father, and siblings and that they have fun together during visits. Visits at this time were six hours, unsupervised, once a week. Mother testified that the family celebrates holidays and birthdays together and that they have family traditions that involve all the children. The Court, after taking into consideration the history of the case outlined in the Petition for Involuntary Termination of Parental Rights, and the fact that the Child has been in CYS custody for a period of forty months as of the April 29, 2024 Hearing, as well as all testimony and evidence admitted at the Hearing, terminated both Mother's and Father's parental rights to the Child.

Orphans' Court Opinion (O.C.O.), 6/19/24, at 4-13 (citations to the record omitted) (style adjusted).

Mother timely filed this appeal. She presents the following four issues for our review:

1. Did the orphans' court err in granting the Petition for Involuntary Termination of Parental Rights when CYS failed to meet its burden pursuant to 23 Pa.C.S.A. §2511(a)(1)?

2. Did the orphans' court err in granting the Petition for Involuntary Termination of Parental Rights when CYS failed to meet its burden pursuant to 23 Pa.C.S.A. §2511(a)(2)?

3. Did the orphans' court err in granting the Petition for Involuntary Termination of Parental Rights when CYS failed to meet its burden pursuant to 23 Pa.C.S.A. §2511(a)(5)?

4. Did the orphans' court err in granting the Petition for Involuntary Termination of Parental Rights when CYS

> > failed to meet its burden pursuant to 23 Pa.C.S.A.
> > §2511(a)(8)?

Mother's Brief at 6-7 (style adjusted).

We begin with our well-settled standard of review:

> The standard of review in termination of parental rights
> cases requires appellate courts to accept the findings of fact
> and credibility determinations of the trial court if they are
> supported by the record. If the factual findings are
> supported, appellate courts review to determine if the trial
> court made an error of law or abused its discretion. A
> decision may be reversed for an abuse of discretion only
> upon demonstration of manifest unreasonableness,
> partiality, prejudice, bias, or ill-will. The trial court's
> decision, however, should not be reversed merely because
> the record would support a different result. We have
> previously emphasized our deference to trial courts that
> often have first-hand observations of the parties spanning
> multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Our Supreme Court has repeatedly stated that in termination cases, deference to the trial court is particularly crucial. *In re Adoption of L.A.K.*, 265 A.3d 580, 597 (Pa. 2021); *see also Interest of S.K.L.R.*, 256 A.3d 1108, 1124 (Pa. 2021) ("When a trial court makes a 'close call' in a fact-intensive case involving…the termination of parental rights, the appellate court should review the record for an abuse of discretion and for whether evidence supports the trial court's conclusions; the appellate court should not search the record for contrary conclusions or substitute its judgment for that of the trial court."). The abuse-of-discretion standard in termination cases "is a highly deferential

standard and, to the extent that the record supports the court's decision, we must affirm even though evidence exists that would also support a contrary determination." ***In re P.Z.***, 113 A.3d 840, 849 (Pa. Super. 2015) (citation omitted); ***see also T.S.M.***, 71 A.3d at 267.

Clear and convincing evidence is evidence that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." ***In re C.S.***, 761 A.2d 1197, 1201 (Pa. Super. 2000) (*en banc*) (quoting ***Matter of Adoption Charles E.D.M., II***, 708 A.2d 88, 91 (Pa. 1998)).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to section 2511(b): determination of the needs and welfare of the child[.]

***In re C.M.K.***, 203 A.3d 258, 261-62 (Pa. Super. 2019) (citation omitted); ***see also Int. of M.E.***, 283 A.3d 820, 830 (Pa. Super. 2022).

Instantly, the orphans' court terminated Mother's rights under 23 Pa.C.S.A. § 2511(a)(1), (2), (a)(5), (a)(8) and (b). Mother has forgone any challenge to Subsection 2511(b). As we may affirm under any ground under

Section 2511(a), we review the court's decision as to Section 2511(a)(2). That Subsection provides:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> […]
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S.A. § 2511(a)(2).

To satisfy Section 2511(a)(2), the petitioning party must establish: "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In re Adoption of A.H.*, 247 A.3d 439, 443 (Pa. Super. 2021). Moreover, grounds for termination under Section 2511(a)(2) "are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied." *Id.* (citing *In re Z.P.*, 994 A.2d 1108, 1118 (Pa. Super. 2010). On this point, we emphasize that "[p]arents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties." *Id*.

Here, the orphans' court determined that CYS met its burden. It noted that the Child had lived with Mother for three months, before going without

- 11 -

parental care for the following three years and seven months. *See* O.C.O. at 15. During his three months with Mother, the Child had to be taken to the hospital multiple times for failure to thrive. *Id.* The court determined Mother denied responsibility for causing the Child's removal and placement. The court found that Mother's cooperation with the reunification was never consistent and, at the time of the termination hearing, the conditions that led to the removal were still present. *Id.* at 15-16. For instance, Mother never obtained stable housing or employment. Mother never successfully completed mental health evaluations or followed through with the subsequent recommendations. *Id.* at 16. Diakon, the service provider, considered closing the parents' case due to Mother's lack of progress. *Id.* Although Mother progressed in her visitation goal, the court noted that she would frequently cancel those visits. Ultimately, the court determined there was "no indication that Mother [] will be able to remedy the issues leading to incapacity, neglect, or refusal [to parent] within a reasonable time." *Id.* at 16-17.

On appeal, Mother argues CYS failed to prove a basis for termination. She cites her progress to support her argument. She notes that her visitation had graduated from supervised to unsupervised. She further cites permanency review orders notating her moderate compliance with her goals. For instance, she explains that one of her goals was to sign releases, which she did. *See* Mother's Brief at 11. She notes that she attended three out of thirteen medical appointments. *Id.*

Mother cites this progress to analogize her case to our decision in *In re I.J.*, 972 A.2d 5 (Pa. Super. 2009). *See generally* Mother's Brief at 20-22. In *I.J.*, the child was removed from the mother's care due to the mother's physical limitations and mental health issues. Two years later, the local protective services agency sought termination under, *inter alia*, Section 2511(a)(2). The court denied termination after it determined the mother had remedied (or made progress in remedying) some of the conditions that resulted in the child's removal, and therefore it was not appropriate to terminate the mother's rights at that time. In other words, the trial court determined that the agency failed to prove the third element of the Section 2511(a)(2) analysis – specifically, that the "conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent." *I.J.*, 972 A.2d at 10. Evidently, the court believed the mother could remedy the conditions. The agency appealed, and on this ground, we affirmed the trial court.[2]

Returning to the instant case, Mother argues that her case is factually similar. She too had a mental health goal, and she too made some progress on her reunification plan. And because she made some progress, she maintains CYS failed to establish that the conditions and causes of placement could not be remedied. *See* Mother's Brief at 22.

_____

[2] We ultimately reversed the trial court's decision and remanded for it to conduct a proper best interests analysis under Section 2511(a)(8). *I.J.*, 972 A.2d at 12-13.

The problem with Mother's argument is that it fails to appreciate the procedural disposition of *I.J.* and the standard of review we must apply to termination cases. In *I.J.*, the trial court determined that the agency failed to meet its burden; it was the agency that appealed. We explained that our standard of review required us to accept the trial court's findings, notwithstanding record evidence which could support an opposite result:

> Our review of the record provides no legal basis on which to disturb this finding, as some evidence in the record supports the conclusion that [the mother's] behavior toward [the child] had improved after her parental rights to [the child's sibling] were terminated, [] and that [the father] had made efforts to maintain his home and attend some scheduled visits with [the child]. [] We do not disagree with [the agency] that a substantial volume of evidence, including extensive testimony from the social workers and the professionals, supports the opposite conclusions (*i.e.*, a lack of significant progress by either parent). ***Under our standard of review, however, we must accept the trial court's factual findings if supported by competent evidence of record – even if the record could likewise support an opposite result.***

*I.J.*, 927 A.2d at 11 (citing *In re A.L.D.*, *Jr.*, 797 A.2d 326, 336 (Pa. Super. 2002) (*overruling on other grounds recognized in* ***Interest of S.K.L.R.***, 256 A.3d 1108 (Pa. 2021))) (emphasis added) (citations to the record omitted).

Here, too, we must accept the court's factual findings if supported by competent evidence. In both cases, the record supports the lower court's decision. But unlike in *I.J.*, in this case CYS prevails. Such is the nature of our role as an error correcting appellate court. We emphasize that the record often supports a contrary result. *See I.J.*, 927 A.2d at 11; ***see also P.Z.*** and

***T.S.M., supra.*** That the orphans' court could have determined that Mother demonstrated sufficient progress to defeat CYS's petition is of no moment. The only question before us is whether the record support's the court's decision. Upon review, we conclude that it does. Mother's claim merits no relief.

Having concluded that termination was proper under Section 2511(a)(2), we need not address the orphans' court's decision under Section (a)(1), (a)(5), or (a)(8). Because Mother did not appeal the court's decision under Section 2511(b), we do not reach the second prong of the termination analysis.

Decree affirmed.

Judgment Entered.

_____

Benjamin D. Kohler, Esq.
Prothonotary

Date: 11/05/2024

- 15 -